Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BOLOURI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BLOOM ENERGY CORPORATION, KR SRIDHAR, RANDY FURR, L. JOHN DOERR, SCOTT SANDELL, EDDY ZERVIGON, COLIN L. POWELL, PETER TETI, and MARY A. AYOTTE,<br><br><br>Defendants. | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Bolouri ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Bloom Energy Corporation ("Bloom" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who: (1) purchased or otherwise acquired Bloom securities pursuant and/or traceable to Bloom's Registration Statement (defined below) issued in connection with Bloom's July 2018 initial public stock offering (the "IPO" or "Offering"); or (2) purchased the publicly traded securities of Bloom between July 26, 2018 and September 16, 2019 (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act") and violations of Sections 10(b) and  20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), and §§11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

3.      Jurisdiction is conferred by §27 of the Exchange Act (15 U.S.C. §77aa) and §22 of the Securities Act (15 U.S.C. §77v). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331.

4.      Venue is proper in this District pursuant to §27 of the Exchange Act, §22 of the Securities Act and 28 U.S.C. § 1391(b), as Defendants conduct business and the Company is headquartered in this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

Class Action Complaint for Violation of the Federal Securities Laws

**PARTIES**

6.     Plaintiff, as set forth in the accompanying Certification, purchased Bloom securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.     Defendant Bloom designs, manufactures, and sells solid-oxide fuel cell systems for on-site power generation.  The Company is incorporated in Delaware and its principal executive offices are located at 4353 North First Street, San Jose, CA 95134. Bloom securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "BE."

8.     Defendant KR Sridhar ("Sridhar") is Bloom's Founder and a director and has been since January 2001; Chief Executive Officer and Chairman of the Board of Directors and has been since April 2002; and President since at least July 2011. Defendant Sridhar reviewed and signed the Registration Statement.

9.     Defendant Randy Furr ("Furr") is Bloom's Chief Financial Officer and has been since April 2015, and Executive Vice President and has been since at least March 2016. Defendant Furr reviewed and signed the Registration Statement.

10.     Defendant L. John Doerr ("Doerr") is Bloom's Lead Independent Director and has been since July 2018 and a director and has been since May 2002. Defendant Doerr reviewed and signed the Registration Statement.

11.     Defendant Scott Sandell ("Sandell") is a Bloom director and has been since August 2003. Defendant Sandell reviewed and signed the Registration Statement.

12.     Defendant Eddy Zervigon ("Zervigon") is a Bloom director and has been since October 2007. Defendant Zervigon reviewed and signed the Registration Statement.

13.     Defendant Colin L. Powell ("Powell") is a Bloom director and has been since January 2009. Defendant Powell reviewed and signed the Registration Statement.

14.     Defendant Peter Teti ("Teti") is a Bloom director and has been since November 2015. Defendant Teti reviewed and signed the Registration Statement.

15.     Defendant Mary K. Bush ("Bush") is a Bloom director and has been since January 2017. Defendant Bush reviewed and signed the Registration Statement.

16.     Defendant Kelly A. Ayotte ("Ayotte") is a Bloom director and has been since November 2017. Defendant Ayotte reviewed and signed the Registration Statement.

17.     Defendants Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, and Ayotte are sometimes referred to herein as the "Individual Defendants."

18.     Each of the Individual Defendants:

(a)     signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Bloom investors, all motivated by their own and the Company's financial interests;

(b)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

- 4 -

Class Action Complaint for Violation of the Federal Securities Laws

19.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

20.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

21.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

22.     On July 24, 2018, Bloom filed with the SEC an amended registration statement on Form S-1, which was signed by the Individual Defendants and was declared effective by the SEC that same day (the "Registration Statement").

23.     On July 26, 2018, Bloom filed with the SEC the final prospectus for the IPO on Form 424B4 (the "Prospectus"), which forms part of the Registration Statement, and sold 18 million shares of Bloom Class A common stock to the investing public at $15 per share for gross proceeds of approximately $284.3 million, net of underwriting discounts, commissions, and estimated offering costs.

24.     The Registration Statement emphasized that the Bloom's servers delivered "clean" energy and reduced carbon emissions. For example, the Registration Statement stated that:

> When running on natural gas, compared to average emissions across the U.S. grid, Bloom Energy Servers reduce carbon emissions by over 50%.

> \*       \*       \*

> We provide an advanced distributed electric power generation solution, based on our proprietary solid oxide fuel cell technology, that provides our customers with a reliable, resilient, sustainable and more cost effective ***clean*** alternative to the electric grid. Our solution, the Bloom Energy Server, is an on-site stationary power generation platform, capable of delivering uninterrupted, 24x7 base load power that is fault tolerant, resilient and ***clean***.

(Emphasis added).

25.     The Prospectus also emphasized that the Bloom systems reduced carbon emissions compared to the traditional power grid:

> The largest environmental impact we can provide is to maximize the deployment of Bloom systems, which reduce carbon emissions and save water compared to traditional power generation systems. Thus, our primary sustainability goal is to maximize sales of Bloom systems and provide the longest and most economically sustainable life cycle possible for the Bloom fuel cells through reliability enhancement programs.

26.     The Registration Statement stated that Bloom expected its fuel cells to average over five years between replacements, stating that "time to stack replacement primarily driven by our fuel cell stack lives—in the early years, replacement was typically 12 to 18 months. Over the years we have made steady improvements in our fuel cell lives, and from 2017 onwards we expect to average over five years between replacements." (internal quotation omitted).

27.     The Registration Statement stated that the estimated depreciable life of the Company's Energy Servers was "15-21 years."

28.     The Registration Statement stated the following regarding recognizing revenue from extended maintenance services:

> The Company typically provides a standard one-year warranty against manufacturing or performance defects to its direct sales customers. The Company also sells to these customers extended maintenance services that effectively extend the standard warranty coverage at the customer's option. These customers generally have an option to renew or cancel the extended maintenance services on an annual basis. Revenue is recognized from such extended maintenance services ratably over the term of the service (or annual renewal period) using the estimates of value, as discussed above.

29.     The Registration Statement downplayed the risk of inaccurate estimates of useful life for its energy servers, stating:

> [I]f our estimates of useful life for our Energy Servers are inaccurate or we do not meet service and performance warranties and guarantees, our business and financial results could be harmed

30.     On March 22, 2019, Bloom filed its annual report on Form 10-K with the SEC for the year ending December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by the

- 6 -

Class Action Complaint for Violation of the Federal Securities Laws

Individual Defendants. Attached to the 2018 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Furr and Sridhar attesting to accuracy of the financial statements and the disclosure of all fraud.

31.    The 2018 10-K stated the following regarding Bloom's environmental impact:

Bloom systems reduce carbon emissions and save water compared to traditional power generation systems. Thus, our primary sustainability goal is to maximize sales of Bloom systems and provide the longest and most economically sustainable life cycle possible for the Bloom fuel cells through reliability enhancement programs.
We seek to minimize our environmental footprint with research and development initiatives designed to extend system operating life while reducing consumption of new material in our Energy Servers. We have an end-to-end recycling approach to recover components from end-of-life units for reuse or recycling and we have dedicated facilities in our manufacturing locations in Delaware and California to inspect and dismantle components removed during scheduled maintenance. We have an audit program to identify improvement opportunities at suppliers and also work to reduce their one-way packaging to minimize materials going to landfills.

32.    The 2018 10-K stated the following regarding Bloom's potential servicing liabilities:

Under the Traditional Lease arrangement, the customer enters into a lease directly with a financier, which pays us for the Energy Servers pursuant to a sales agreement (a Financing Agreement, described below). We recognize product and installation revenue upon acceptance. After the standard one-year warranty period, our customers have almost always exercised the option to enter into operations and maintenance services agreements with us, under which we receive annual service payments from the customer. The price for the annual operations and maintenance services is set at the time we enter into the Financing Agreement. The duration of our Traditional Leases ranges from 6 to 15 years.

*      *      *

Service revenue is generated from operations and maintenance services agreements that extend the standard one-year warranty service coverage beyond the initial one-year coverage for Energy Servers sold under direct purchase, traditional lease and managed services sales. Customers of our purchase and lease programs can renew their operating and maintenance services agreements on an annual basis for the life of the contract at prices predetermined at the time of purchase of the Energy Server. We anticipate that almost all of our customers will continue to renew their operations and maintenance services agreements each year.

*      *      *

Class Action Complaint for Violation of the Federal Securities Laws

The Company typically provides to its customers a standard one-year warranty against manufacturing or performance defects. The Company also sells to these customers extended maintenance services that effectively extend the standard one-year warranty coverage at the customer's option. These customers generally have an option to renew or cancel the extended maintenance services on an annual basis. Revenue is recognized from extended maintenance services ratably over the term of the service (or annual renewal period) using the estimates of value, as discussed above.

33.     The 2018 10-K stated that the estimated useful life Bloom's energy servers was "15-21 years."

34.     The statements referenced in ¶¶22-33 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Bloom's technology produced emissions comparable to that a modern natural gas plant; (2) Bloom's estimates of useful life for its energy servers and fuel cells were inaccurate; (3) Bloom used misleading accounting to mask the effect of future servicing expenses; (4) consequently, Bloom will potentially be liable for up to $2.2 billion in undisclosed servicing liabilities; and (5) as a result, Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

35.     On September 17, 2019, before the market opened, Hindenburg Research published a scathing report entitled "Bloom Energy: A "Clean" Energy Darling Wilting to its Demise" (the "Report"). The Report claimed that Hindenburg had uncovered an estimated $2.2 billion in undisclosed servicing liabilities, and that Bloom's technology was "not sustainable, clean, green or remotely profitable" despite Bloom's claims to the contrary.

36.     The Report explained that Bloom's technology barely produced less emissions on the U.S. Electric Grid but rather produced comparable emissions to that of a modern natural gas plant, in relevant part:

Bloom claimed in its prospectus:

- 8 -

Class Action Complaint for Violation of the Federal Securities Laws

"When running on natural gas, compared to average emissions across the U.S. grid, Bloom Energy Servers reduce carbon emissions by over 50%." [Prospectus Pg. 4]

This statement appears to be outright false, and by a wide margin. According to the latest official figures from the U.S. Energy Information Administration (EIA), the U.S. grid emits 1,009 lbs/MWh of $CO_2$.

Bloom's own marketing documents show that its servers produce 679-883 lbs/MWh of $CO_2$, a 12.5% to 32% reduction from the grid average.

[image omitted]

Our own review of 205 Bloom projects in New York and California showed that they are producing an average of 835 lbs/MWh of $CO_2$, a reduction of about 17.2% from the grid.

*       *       *

A proper comparison would be between a new natural gas-operated Bloom system and a modern natural gas power plant. Using data from the U.S. Department of Energy, we plotted data from Bloom's new generation systems relative to the average for a modern combined cycle natural gas power plant.

[image omitted]

The numbers are comparable. Bloom's newest generation systems emit roughly 839 lbs/$CO_2$ per MWh on average versus a modern natural gas plant that produces 896 lbs/$CO_2$ per mWh. [Pg. 18] The average across all 205 Bloom outstanding projects in New York and California was also comparable at ~835 lbs/$CO_2$ per MWh.

Note that as Bloom's systems age and efficiency goes down, they produce more $CO_2$. (See the appendix for the inverse relationship between efficiency and emissions.) According to the data we reviewed, after only about 24 months, Bloom's systems will produce $CO_2$ levels on par with modern combined cycle natural gas plants (and then perform worse thereafter).

Bloom's generators also result in the creation of carcinogenic hazardous waste, which the company has allegedly improperly dumped into public landfills. Lawsuit exhibits reveal that Bloom labeled itself with the EPA as a "large quantity generator" of hazardous waste. The exhibits include pictures of Bloom employees wearing respirators as they handle 55-gallon drums of what appears to be hazardous waste from emptied/cleaned collection canisters.

Class Action Complaint for Violation of the Federal Securities Laws

To make matters worse, the company has procured over $1.1 billion in federal, state, and local subsidies, often *under the auspices* of being green, clean, or renewable. As we will show, Bloom is *none of these* and lately, multiple states have wised up and begun to withdraw or step-down subsidies as a result – a move that we expect will further cripple Bloom's business model.

*       *       *

Bloom and its customers have consumed over a billion dollars in federal, state, and municipal clean energy subsidies, yet Bloom emits more $CO_2$ than the grid in key states it operates. In fact, our findings show that the amount of $CO_2$ ***Bloom Energy servers release into the air is comparable to modern natural gas power plants.***

(Emphasis added).

37.     The Report also declared that Bloom has an "estimated $2.2 billion in undisclosed servicing liabilities." The liabilities arise from the fact that Bloom enters into servicing contracts that expose Bloom to massive risk, stating in part:

Backing up for a moment, one might ask—how does a new, relatively unproven company like Bloom manage to sell so many fuel cell systems to so many Fortune 100 companies, when fuel cell economics have repeatedly failed in the real world?

The answer is that Bloom's contracts guarantee baseline performance levels—essentially locking in the price of electricity for its customers. Per Bloom's marketing literature:

[image omitted]

"We offer the ability to ***lock in cost for electric power*** (other than the price of natural gas) over the long-term…we provide a solution that ***includes all of the fixed-equipment and maintenance costs for the life of the contract***."

This is an incredibly attractive deal for customers, who can (and do) tout their forward-thinking ways while also locking in cheap electricity.

Conversely, what this means for Bloom is that when the electrical output of its systems decline—***they are on the hook to replace them.*** Bloom has noted this as a key risk in its filings:

"If our estimates of useful life for our Energy Servers are inaccurate or we do not meet service and performance warranties and guarantees, or if we fail to accrue

- 10 -

Class Action Complaint for Violation of the Federal Securities Laws

adequate warranty and guaranty reserves, our business and financial results could be harmed." (10-Q Pg. 70)

Bloom is responsible for two types of replacements: its fuel cell servers (the system itself) and the individual fuel cells that go inside the servers.

As experts have confirmed to us, the high operating temperatures of solid oxide fuel cells (800C or 1400F, and higher) make them extremely susceptible to wear and tear.

A fuel cell technician with 19 years of experience in the field made this clear to us and brought up what would be a recurring theme with multiple experts we spoke to, durability:

"Bloom Energy is also a high temperature type application. They are using solid oxide fuel cells, which is a very temperamental fuel cell in the first place. ***High temperatures create a lot of issues*** whenever you're dealing with the expansion of different components in it. I mean, you're going up to 7-8-900 C. ***<u>Whenever you're hitting those kinds of temperatures and then you're cooling back down, everything is expanding and contracting at different rates and those type of fuel cells suffer significantly from breakage through those varying thermal cycles</u>***."

Our research has found that Bloom's fuel cells and systems degrade significantly faster than expectations, yet the company barely records any liability for these issues.

(Emphasis added).

38.     The Report described the misleading accounting that allowed for Bloom to disguise its servicing liabilities and mask service losses:

So, how does Bloom justify largely ignoring its multi-year servicing liabilities?

We found a simple little line, buried on page 91 of Bloom's 10-K, that explains it. (Note that this line was ***NOT*** in the company's IPO prospectus):

"Customers may renew the MSAs (master service agreements) leading to future expense that is not recognized under GAAP until the renewal occurs." [Pg. 91]

At first glance, this line looks rather benign. But what it means is that the company only books the ***next year*** of servicing liabilities, rather than accounting for the liabilities across the full 10-25 years of the contract.

Why? Because *technically* the customers have the **option** to renew their service contract every year that they could – *technically* – choose not to exercise. Per the same filing:

"The warranty and guaranty **may be** renewed **annually** at the customer's **option** – as an operations and maintenance services agreement – at predetermined prices for a period of up to 25 years." [Pg. 39]

The obvious question is: *why wouldn't they renew*? What customer wouldn't push a 'free money' button that essentially guarantees them cheap, long-term electricity by renewing their service contract?

Even Bloom acknowledges that customers don't cancel these agreements:

"*virtually no customers have elected to cancel their maintenance agreements*" [Prospectus Pg. 123]

We found zero examples of customers not renewing these service agreements. Nonetheless, **Bloom records its servicing liabilities as if every customer will cancel every year.** It's no surprise why this seems to have gone largely unnoticed given where it was buried in the financials:

[image omitted]

*     *     *

This is not the first time Bloom has employed this type of accounting alchemy.

In Bloom's IPO prospectus, it disclosed replacing 172 early generation servers in 2016 [Pg. 66]. Once again, Bloom recorded the server replacements as **NEW** sales and classified cash outlays as investments instead of taking a servicing loss.

Bloom achieved this by determining that the server replacements involved such significant renegotiation of its old leases that it actually constituted a termination of the lease. We believe this, in turn, conveniently allowed them to **book substantial write-downs in the pre-IPO period** (where investors couldn't see the write-down) while booking new revenue that improved the financials disclosed publicly in the IPO.

[image omitted]

 (Source: IPO Prospectus Pg. 100)

"Since the underlying assets under the arrangement were replaced (i.e., new generation Energy Servers were installed in place of the decommissioned older

Class Action Complaint for Violation of the Federal Securities Laws

generation Energy Servers), the decommissioning of Energy Servers under the program did not constitute a lease modification, and was accounted for as a lease termination. Through December 31, 2017, *the Company has replaced 196 Energy Servers with new generation Energy Servers sold as part of a new sales arrangement*." [Prospectus F-39]

"During 2015, the Company recorded a reduction in product revenue totaling $41.8 million for the decommissioning of its PPA I Energy Servers." [Prospectus F-39]

"In *2016* and 2017, *172* and 0 respectively, of our acceptances achieved were for Energy Servers that were sold to existing customers under our PPA I decommissioning program." [Prospectus 66]

We find it incredibly alarming that Bloom seems to be engaging in transactions that avoid recognizing servicing losses in a forthright manner that is transparent to investors—or in some cases, *recognizing them at all*.

(Emphasis added).

39.   The Report provided data and testimonials from experts showing that Bloom will need to replace fuel cells before 3 years on average, not the five years that Bloom claimed:

We have sourced extensive public data in order to track how Bloom's systems are actually performing.

As stated earlier, the major costs associated with Bloom's long-term service liabilities relate to degradation or damage to its (1) fuel cells and (2) fuel cell servers.

We'll start by discussing its fuel cells.

Bloom has claimed to have made big improvements to the life of its fuel cells, stating that fuel cells installed in 2017 and onward will have a lifespan of over five years:

"Time to stack replacement' primarily driven by our fuel cell stack lives—in the early years, replacement was typically 12 to 18 months. Over the years we have made steady improvements in our fuel cell lives, and *from 2017 onwards we expect to average over five years between replacements*." [IPO Prospectus Pg. 61]

We have tracked data on Bloom projects installed since 2017 through state utility records in New York and California. There were 35 projects in all. After aggregating this data, we found that even Bloom's newest fuel cells will degrade

Class Action Complaint for Violation of the Federal Securities Laws

below replacement thresholds in under 3 years, significantly below the company's "expectations". We present this data later in the report.

Our findings were corroborated by multiple experts in the field who were highly skeptical of Bloom's claim that solid oxide fuel cells could last 5 years or longer in the field.

We asked one professional fuel cell technician, with 19 years of experience, whether he believed the company's claims to be able to run solid oxide fuel cells for 5 years. He responded with a curt "no". When asked if the same fuel cells could operate for three years, he replied:

**"Do I believe claims of 3 years before service is needed? No. I would be highly skeptical."**

Another expert we contacted, with 14 years of experience working in Fuel Cells and Fuel Cell Performance Analysis, who also has a B.S., M.S., and a PhD in Chemical Engineering, also warned about temperature and durability preventing Bloom's cells from running for 5 years:

"They are using the high temperature materials, I think. So, there is advantages and disadvantages. *The disadvantage is that degradation is probably high. I doubt they have 5 years life. They may have 1 or 2 max. They cannot achieve 5 years. Or maybe if they have to replace part of the stack*, they can achieve 5 years. In general, it's really hard for SOFCs to run 5 years."

(Emphasis added).

40.    The Report also provided evidence showing Bloom's estimated depreciation of 15-21 years for its fuel cell servers was dramatically overoptimistic:

Moving on to the liabilities associated with replacing Bloom's servers (as opposed to *just* the fuel cells), our first check was to see how long the company estimates they will last. Keep in mind that these systems run continuously at temperatures around 800C (or 1400F) in real-world conditions.

Bloom shows, in its depreciation schedule, that it expects its servers to last for 15-21 years [Pg. 95]:

[image omitted]

We think this depreciation schedule is horribly askew from reality.

- 14 -

For instance, Bloom sold servers in 2010-2012 that lasted only 4-6 years. They had been replaced entirely by 2016. [Pg. F-39]

Bloom also installed servers in Delaware in 2012 that are now being replaced after just 7 years, as announced this past quarter. [Pg. 11]

The company itself acknowledged that it had failed to achieve its own estimates previously:

"*Early generations of our Energy Server did not have the useful life and did not perform at an output and efficiency level that we expected.*" [Pg. 70]

We are now being asked to trust the new estimates, which look to represent approximately a 3x improvement on prior server lifespans. *Yet the company thoroughly disclaims its own estimates*, declaring them to be a key risk factor:

"Our pricing of [customer] contracts and our reserves for warranty and replacement are based upon our estimates of the life of our Energy Servers and their components, including assumptions regarding improvements in useful life that may fail to materialize. *We do not have a long history with a large number of field deployments, and our estimates may prove to be incorrect.*" [Pg. 70]

Finally, our field research corroborates that Bloom's servers have experienced trouble in the real world.

We contacted several businesses to learn about the reliability of Bloom's new systems. A Home Depot in Greenbush, NY, told us that they had a system "blow" within a year of having it installed. New York utility records show that the system was new, operating since December 2018. They also appear to show sharp drop-offs in electricity generated, consistent with what we were told.

[image omitted]

We were told that another Home Depot, in Clifton Park, NY, [operating since September 2018] had its server come right off the building shortly after its installation, according to the same conversation. (We share more details on this conversation, as well as conversations with other customers and experts, in Part IV of this report.)

In short, Bloom's expected server life is untested at best, and its history has demonstrated a 4-7 year lifespan.

Even if we assume just 1 server replacement on an average outstanding contract life of 13 years, we estimate this to result in a nearly $1.5 billion unrecorded servicing liability:

- 15 -

[image omitted]

(Emphasis added).

41.     The Report further described why these servicing issues were an "imminent problem:"

We believe that this absurd juggling act is coming to an end and will culminate in an erosion of the company's remaining cash over the next 6-12 months.

For starters, the company isn't done replacing outdated servers and has acknowledged that it needs to secure $92 million in financing to finish the latest batch of replacements [Pg. 32]

We have also begun to see a slew of 'one time' charges and write-downs that we fully expect will continue in relation to upcoming server replacements. From the recent quarter alone [Pg. 35]:

1.     "We had repurchased and ***written-off*** 10.0 megawatts of our earlier generation energy servers for ***$25.6 million***"
2.     "We recognized ***charges*** related to the decommissioning of PPA II Energy Servers of ***$8.1 million***"
3.     "Additionally, in paying-off the outstanding debt and interest of PPA II amounting to $77.7 million, ***we incurred a debt payoff make-whole penalty of $5.9 million***"
4.     "We had PPA II debt issuance ***costs written-off of $1.0 million*** and additional interest expense incurred for PPA 2 debt payoff of $0.1 million"

Finally, we took the current efficiency of Bloom's California and New York projects, roughly 200 in all, and found that almost 15% of its projects likely need *imminent* fuel cell replacements, with almost 40% needing replacements within an estimated 14 months.

[image omitted]

Extrapolating this data out, we estimate a $55 million imminent replacement liability with another estimated $147 million replacement liability over the next 14 months. Once again, this is just relating to fuel cell liabilities and does not include additional server replacement liabilities.

(Emphasis added).

42.     On this news, Bloom's shares plummeted $0.88 per share, or over 21%, to close at $3.31 per share on September 17, 2019, damaging investors.

43.     Since the IPO, and as a result of the disclosure of material adverse facts omitted from Bloom's Registration Statement, Bloom's stock price has fallen substantially below its IPO price, damaging Plaintiff and Class members.

44.     Additionally, due to the materially deficient Registration Statement, Defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

45.     SEC Regulation S-K, 17 C.F.R. § 229.503, required the "Risk Factor" section of the Registration Statement to discuss the most significant factors that made the Offering risky or speculative and that each risk factor adequately described the risk. Defendants' failure to disclose the already occurring significant problems underlying its base business, as well as the likely material effects it would have on the Company's share price, rendered the Registration Statement's many references to known risks that "*if*" occurring "*may*" or "*could*" adversely affect the Company as false and misleading. These so-called "risks" were already materializing before the Offering.

46.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Bloom pursuant to the Registration Statement and/or during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

48.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Bloom securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

49.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

50.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

Class Action Complaint for Violation of the Federal Securities Laws

-    whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

-    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

-    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

-    whether the prices of Bloom securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

-    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

52. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

53. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

54. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

-    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

-    the omissions and misrepresentations were material;

-    Bloom securities are traded in efficient markets;

Class Action Complaint for Violation of the Federal Securities Laws

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Bloom securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

55.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

56.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

### COUNT I

### Violations of Section 11 of the Securities Act
### Against All Defendants

57.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.  This claim is not based on and does not sound in fraud.

58.     This claim is brought by Plaintiff and on behalf of other members of the Class who purchased or otherwise acquired Bloom securities pursuant to or traceable to the Company's IPO. Each member of the Class acquired his, her, or its shares pursuant to and/or traceable to, and in reliance on, the Registration Statement. Bloom is the issuer of the securities through the Registration Statement, on which the Individual Defendants were signatories.

59.     Defendants issued and disseminated, and caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements and/or omissions to the investing public that were contained in the Registration Statement, which misrepresented or failed to disclose, among other things, the facts as set forth above. By reason of the conduct alleged

herein, each Defendants violated and/or controlled a person who violated Section 11 of the Securities Act, 15 U.S.C. §77k.

60.     Bloom is the issuer of the securities sold via the Registration Statement. As issuer of these securities, the Company is strictly liable to Plaintiffs and the Class members for the material misstatements and omissions contained therein.

61.     At the times they obtained their shares of the Company, Plaintiffs and the members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.

62.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

63.     At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Bloom securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.

64.     By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of Section 11(e), 15 U.S.C. 77K(e), from the Defendants and each of them, jointly and severally.

<u>**COUNT II**</u>
<u>**Violations of Section 15 of the Securities Act Against**</u>
<u>**the Individual Defendants**</u>

65.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

66.     This claim is asserted against the Individual Defendants, each of whom was a control person of the Company at relevant times.

67.     The Individual Defendants were control persons of the Company by virtue of, inter alia, their positions as senior officers and/or directors of the Company, and they were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

Class Action Complaint for Violation of the Federal Securities Laws

68.     The Individual Defendants did not make reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statementwere accurate complete in all material respects. Had they exercised reasonable care, they could have known of the material misstatements and omissions alleged herein.

69.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and within three years after Bloom securities were sold to the Class in connection with the IPO. It is therefore timely.

70.     By reason of the above conduct, for which the Company's is primarily liable, as set forth above, Individual Defendants are jointly and severally liable with and to the same extent as Bloom pursuant to Section 15 of the Securities Action, 15 U.S.C. 77o.

**COUNT III**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.      During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

Class Action Complaint for Violation of the Federal Securities Laws

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Bloom securities during the Class Period.

75. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

76. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

77. As a result of the foregoing, the market price of Bloom securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Bloom securities during the Class Period in purchasing Bloom securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

78. Had Plaintiff and the other members of the Class been aware that the market price of Bloom securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's

and the Individual Defendants did not disclose, they would not have purchased Bloom securities at the artificially inflated prices that they did, or at all.

79.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

80.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Bloom securities during the Class Period.

**COUNT IV**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

81.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bloom securities.

85.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

86.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 4, 2019                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

- 25 -

Class Action Complaint for Violation of the Federal Securities Laws

Counsel for Plaintiff

Class Action Complaint for Violation of the Federal Securities Laws